IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

MICHELLE FREENOR; STEVEN )
FREENOR; DAN LEGER; JEAN )
SODERLIND; and GHOST TALK, GHOST )
WALK LLC; )
                 )
      Plaintiffs, )
                 )
v. )     CASE NO. CV414-247
                 )
MAYOR AND ALDERMAN OF THE CITY )
OF SAVANNAH, )
                 )
      Defendant. )
                 )

## O R D E R

Before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 30), Plaintiffs' Second Motion for Summary Judgment (Doc. 66), and Defendant Mayor and Alderman of the City of Savannah's (the "City") Motion for Summary Judgment (Doc. 33). For the following reasons, the City's Motion for Summary Judgment (Doc. 33) is **DENIED IN PART** and **HELD IN ABEYANCE IN PART** and Plaintiffs' First Motion for Summary Judgment (Doc. 30) and Second Motion for Summary Judgment (Doc. 66) are **GRANTED IN PART** and **HELD IN ABEYANCE IN PART**.

### BACKGROUND

This case involves a First Amendment challenge to the City of Savannah's regulation of tour guides and the assessment of a fee on sightseeing tours. (Doc. 1; Doc. 66.) Plaintiffs

challenge two aspects of the City's ordinances. In Count I, Plaintiffs contend that the City's tour guide licensing scheme, which was codified within the Tour Service Ordinance of 1978 at Savannah Code of Ordinances §§ 6-1502, 6-1508—1515, and 6-1550 (the "Tour Guide Licensing Ordinance"[1]), violates the First Amendment to the United States Constitution. (Doc. 64 at 20-21.) In Count II, Plaintiffs claim that the assessment of a preservation fee on all sightseeing tours conducted within the Savannah Historic District pursuant to City Revenue Ordinance, Article T, § 3 (the "Preservation Fee") violates the First Amendment as an impermissible tax on free speech. (Id. at 21.)

The Tour Service Ordinance of 1978, codified at Savannah Code of Ordinances § 6-1501 et seq., is a set of ordinances that governs the tour guide industry in Savannah, Georgia. In November 2014, at the time Plaintiffs filed their suit, the Tour Service Ordinance of 1978 contained sections that required licensure of individual tour guides. Pursuant to Savannah Code of Ordinances § 6-1508, individuals were prohibited from "act[ing] or offer[ing] to act as a tour guide within the city or play a role during a tour . . . unless the driver of the vehicle or the person acting or offering to act as a tour guide

---

[1] As addressed below, the City has subsequently repealed the portions of the Tour Service Ordinance of 1978 that pertained to the tour guide licensing scheme. The Court refers to the challenged, and now repealed, portions of the Tour Service Ordinance of 1978 as the Tour Guide Licensing Ordinance.

shall first obtained and shall have them in force a tour guide permit." (Doc. 30, Attach. 21 at 4.) A "walking tour guide" was defined in Savannah Code of Ordinances § 6-1502 as "[a]ny person who has passed the tour guide examination and received a tour guide permit [that] conducts walking tours" and a "certified tour guide" was "any person who has passed the tour guide examination . . . ." (Id. at 3.) A "tour guide permit" was defined as "[t]he written authority granted by the city for an individual to drive or operate a tour service vehicle or to conduct any tours for hire within the city." (Id. at 2.) In order to receive a permit, a prospective tour guide had to submit an application, Savannah Code of Ordinances § 6-1509, submit a "certificate from a reputable physician certifying" that the applicant did not suffer from any infirmity that would render him or her an unsatisfactory tour guide, Savannah Code of Ordinances § 6-1510, pass a criminal background check, Savannah Code of Ordinances § 6-1511, and pass a written examination, Savannah Code of Ordinances § 6-1514. (Doc. 33, Attach. 21 at 4-5.)

The written examination was "designed to test the applicant's knowledge of history and architecture of the city," and required the applicant to correctly answer 80 percent of the questions to pass. (Id. at 5.) The exam consisted of a 100-question multiple choice section and a fill in the blank

3

section. (Doc. 30, Attach. 10 at 7.) The questions for the exam were drawn from the Manual for the Instruction and Licensing of Tour Guides in the City of Savannah (the "Manual"), a study guide that was "designed to provide a history for tour guides to study" and contained information on "important buildings, monuments and fountains." (Doc. 30, Attach. 10 at 20; Doc. 30, Attach. 25 at 3.)

Once a tour guide received his or her permit, the tour guide was required to renew the permit each year, Savannah Code of Ordinances § 6-1518, and re-take the examination every three years, Savannah Code of Ordinances § 6-1514. (Doc. 30, Attach. 21 at 5-6.) The City's Revenue Ordinance, Article T, § 2(D) set the tour guide permit fee at $10 per year, the tour guide test fee for a first-time applicant at $100, and the tour guide test fee for the third-year renewal at $25. (Doc. 33 at 67.)

The City also levies "a preservation fee on sightseeing tour companies which conduct tours within Savannah." (Doc. 33 at 68.) The Preservation Fee, codified at Savannah Revenue Ordinance, Article T, § 3, is charged per person for each sightseeing tour taken in the following amounts: $1.00 per adult passenger and full-fare child, $.50 per child 12 years and under, and no fee for children three years of age or younger, provided that no tour fee was charged. (Id.) The Preservation

Fee applies to "sightseeing tours conducted within the Historic District of Savannah," provided that

> the fee for motor coach tours shall be as provided above in Section 2 of this Article T; and provided further that the fee shall not apply to (a) tours which originate or embark from within the Historic District, travel out of the District by the most direct arterial route, and are conducted wholly outside the District, and (b) persons boarding a tour boat for dining and on-board entertainment purposes where a sightseeing tour is not the focus or emphasis of the event and where no tour narration is provided.

(Doc. 33 at 68.) The Preservation Fee is to be remitted to the City Revenue Department each month on forms prescribed by the Revenue Department. (Id. at 69.)

Plaintiff Michelle Freenor was licensed as a tour guide in Savannah and leads tours under the business name "Savannah Belle Walking Tours." (Doc. 31 at 1.) Plaintiff Steven Freenor, the husband of Michelle Freenor, has never been licensed as a tour guide in Savannah and was not licensed because he did not want to take the examination required to receive a permit. (Id.) Plaintiff Dan Leger was licensed as a tour guide in Savannah and leads tours under the business name "Savannah Dan." (Id. at 2.) Plaintiff Jean Soderlind was formerly licensed as a tour guide in Savannah, but was not licensed at the time of filing the complaint. (Id.) Plaintiff Soderlind owns and operates Plaintiff Ghost Talk, Ghost Walk LLC ("Ghost Talk"). (Id.) Plaintiff Ghost

Talk is a business that offers ghost tours of Savannah and hires tour guides to give tours. (Id.)

Plaintiffs filed their complaint on November 17, 2014, seeking a declaratory judgment that the Tour Guide Licensing Ordinance and the Preservation Fee violates the First Amendment to the United States Constitution, injunctive relief prohibiting the City from enforcing the Tour Guide Licensing Ordinance and the Preservation Fee, an award of attorneys' fees and costs, and an award of nominal damages in the amount of $1 to each Plaintiff. (Id. at 21-22.) On July 30, 2015, Plaintiffs and the City each filed their respective motions for summary judgment. (Doc. 30; Doc. 33.)

However, while the cross-motions for summary judgment were still pending, the City amended the Tour Service Ordinance of 1978 in October of 2015 and repealed the licensing scheme that Plaintiffs challenged as unconstitutional. As amended, the Tour Service Ordinance of 1978 dropped the "certified" language from the definition of "tour guide" and amended the definition of "walking tour guide" in the Savannah Code of Ordinances § 6-1502 to remove references to the examination. (Doc. 46, Attach. 1 at 4.) The section that prohibited an individual from giving tours without a permit, Savannah Code of Ordinances § 6-1508, was repealed in its entirety and reserved for later use. (Id.) Savannah Code of Ordinances § 6-1509 was amended to no longer

require a prospective tour guide to apply for a permit and instead provides that tour service companies must register the tour guide with the City by providing the name of the guide, the name of tour company, and contact information. (Id. at 4–5.) There is no fee to register guides. (Id.)

Savannah Code of Ordinances § 6-1510 was previously repealed in 2014 and there is no longer a requirement that guides be certified by physicians. (Doc. 33 at 7.) Savannah Code of Ordinances § 6-1511 was deleted in its entirety and reserved for later use, thus eliminating the qualification requirements, including the background check, for tour guide applicants. (Doc. 46, Attach. 1 at 5.) Savannah Code of Ordinances § 6-1512 was amended to remove reference to a "certified tour guide." (Id.) Savannah Code of Ordinances §§ 6-1513—6-1515 were deleted in their entirety and reserved for future use. (Id.) Finally, Savannah Code of Ordinances § 6-1550 was amended to remove references to the "permit holder." (Id. at 13.) Thus, under the Tour Service Ordinance of 1978 as it currently stands, there is no longer a requirement for prospective tour guides to have a city-issued permit before leading tours.

On October 30, 2015, the City filed a supplemental brief arguing that these amendments rendered moot Plaintiffs' claim seeking injunctive relief related to the tour guide permitting requirements. (Doc. 46 at 2.) Plaintiffs disagreed and argued

that the amendments did not render any part of the case moot as
Plaintiffs were seeking nominal damages in addition to
injunctive relief and, further, there was no "further assurance"
from the City regarding its intent not to reenact the
ordinances. (Doc. 47 at 1.) On March 28, 2016, this Court
entered an order holding the cross motions for summary judgment
in abeyance until the parties briefed the issue of mootness.

The parties filed their respective briefs arguing the
merits of mootness. On August 28, 2017, the City supplied the
Court with supplemental authority regarding the mootness
question and notified the Court of the decision by the United
States Court of Appeals for the Eleventh Circuit in Flanigan's
Enterprises, Inc. of Georgia v. City of Sandy Springs, 868 F.3d
1248 (11th Cir. 2017), which changed Eleventh Circuit law
regarding the impact of a claim for nominal damages on the
question of mootness. (Doc. 57.) In response to this change in
law, Plaintiffs sought leave to amend their complaint (Doc. 59),
which was granted (Doc. 63). Plaintiffs filed their amended
complaint on September 20, 2017 to add a claim for damages in
the amount of $10.00 for Plaintiffs Michelle Freenor and Leger.
(Doc. 64.) Plaintiffs filed their Second Motion for Summary
Judgment on October 5, 2017 incorporating their first motion for
summary judgment. (Doc. 66.) The City answered the amended
complaint (Doc. 65) and responded to Plaintiff's Second Motion

for Summary Judgment (Doc. 68). The matter is now ripe for the Court's review.

## ANALYSIS

I.  <u>STANDARD OF REVIEW</u>

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is essential. <u>DeLong Equip. Co. v. Wash. Mills Abrasive Co.</u>, 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis

> for its motion, and identifying those
> portions of the pleadings, depositions,
> answers to interrogatories, and admissions
> on file, together with the affidavits, if
> any, which it believes demonstrate the
> absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

## II. MOOTNESS

Before turning to the merits of the cross motions for summary judgment, this Court must first evaluate whether the amendment to the City's Tour Service Ordinance of 1978 renders

moot any part of this action. It is settled law that " 'federal courts may adjudicate only actual, ongoing cases or controversies.' " <u>Flanigan's Enter.</u>, 868 F.3d at 1255 (quoting <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. 472, 477, 110 S. Ct. 1249, 1253, 108 L. Ed. 2d 400 (1990)). A case generally becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." <u>Id.</u> (internal citation and quotations omitted). If a case becomes moot at any time, it must be dismissed. <u>Id.</u>

First, this Court must determine if the amendment to the City's Tour Service Ordinance of 1978 has rendered moot Plaintiffs' claims for declaratory and injunctive relief. If so, this Court must determine whether the recently pled damages in the amount of $10 for Plaintiffs Michelle Freenor and Leger save Plaintiffs' first count. Neither party argues that Plaintiffs' second count has been affected or mooted by the City's amendment to the ordinance. Thus, Plaintiffs' claim that the City's revenue ordinance, codified at Savannah 2014 Revenue Ordinance Article T, § 3, assessing a preservation fee on sightseeing tours in the historic district violates the First Amendment of the United States Constitution will be discussed below.

The City argues that the amendment of the Tour Service Ordinance of 1978 renders moot Plaintiffs' claims for declaratory and injunctive relief. (Doc. 46 at 2.) The City

further contends that the repeal or amendment is a clear indication of unambiguous termination. (Id.) Plaintiffs initially argued that their claims were not moot absent some further assurance from the City that the challenged law would not be reinstated. (Doc. 47 at 1.) Plaintiffs later agreed that "their claim for injunctive and declaratory relief barring enforcement of that law has become moot" after the City's representation that it does not intend to reenact the challenged portions of the ordinance. (Doc. 52 at 1.) Plaintiffs, however, subsequently supplied this Court with supplemental authority and argued that under Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012, 198 L. Ed. 2d 551 (2017), their claims for injunctive and declaratory relief may not be moot. (Doc. 54 at 2-3.)

As discussed above, a case becomes moot when the issues are no longer "live" in that the parties no longer have a legally cognizable interest in the outcome. Flanigan's Enters., 868 F.3d at 1255. However, "voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 174, 120 S. Ct. 693, 700, 145 L. Ed. 2d 610 (2000). Thus, the standard for determining "whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events made it absolutely clear that

the allegedly wrongful behavior could not reasonably be expected to recur.' " Id. at 189 (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S. Ct. 361, 364, 21 L. Ed. 2d 344 (1968)). Trinity Lutheran does not alter or change the mootness standard. In fact, Trinity Lutheran simply reaffirmed that "voluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " 137 S. Ct. at 2019 n.1 (quoting Friends of the Earth, Inc., 528 U.S. at 189, 120 S. Ct. at 708) (alteration in original).

A government's repeal of an ordinance is ordinarily "one of those events that makes it absolutely clear that the allegedly wrongful behavior . . . could not reasonably be expected to recur." Flanigan's Enters., 868 F.3d at 1256 (internal citations and quotation marks omitted). The plaintiff then bears the burden to present affirmative evidence that its challenge is no longer moot. Id. The evidence presented must be more than " '[m]ere speculation that the City may return to its previous ways.' " Id. (quoting Nat'l Advert. Co. v. City of Miami, 402 F.3d 1329, 1334 (11th Cir. 2005)). The Eleventh Circuit recently summarized this standard and stated that "[t]he key inquiry . . . is whether the evidence leads us to a reasonable expectation that the City will reverse course and reenact the

13

allegedly offensive portion of its Code" should the court dispose of the case on mootness grounds. Id. Three factors guide this analysis: (1) whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate the court's jurisdiction, (2) whether the government's decision to terminate the challenged conduct was "unambiguous," and (3) whether the government has consistently maintained its commitment to the new policy or legislative scheme. Id. at 1257.

Applying these factors to the mootness question presented in this case, the Court finds that Plaintiff has not presented evidence that supports a finding that the City will "change course" and reenact the repealed portions of the Tour Service Ordinance of 1978. First, Plaintiff argues that the repeal was motivated, at least in part, by tactical considerations in an effort to resolve Plaintiffs' pending motion for summary judgment. (Doc. 47 at 4.) However, other than the statement that the City Attorney made at a City Council meeting about why the change should be made quickly, Plaintiff has not supplied the Court with any other evidence that indicates the City's plan to reenact the licensing scheme. Further, Plaintiff has frequently argued that the fact that the City has repealed the challenged portions of the ordinance indicates that the law was unconstitutional and cites the City's 2018 Tourism Management Plan to show that the City has "adopted one of Plaintiffs'

proposed less-restrictive alternatives since repealing its licensing law." (Doc. 72 at 1-2.) These facts cut against Plaintiffs' argument that the City intends to reenact the challenged licensing scheme.

Plaintiff additionally provided the minutes from a City Council meeting on February 14, 2018 in which the City discussed the City's policy to encourage tour guide companies to seek voluntary certification of its guides through the Tourism Leadership Council's Certified Tour Guides of Savannah Program and adopted the recommendations of the Tourism Management Plan. The minutes reveal the City's policy and indicate that the shift is not purely a temporary fix to defeat the jurisdiction of this Court. City Manager Hernandez, in response to a concern that tour guides give out inaccurate history, stated that the voluntary certification through the Tourism Leadership Council would improve the quality of tours but that the City "can't be in the business of regulating content." (Doc. 72, Attach. 3 at 13.) Mayor DeLoach also stated that "[m]y deal is the City doesn't need to be in business of checking tour guides." (Id. at 14.)

In regards to the second factor, the Court finds that termination is unambiguous. The City did not just stop enforcing the licensing scheme, but instead repealed or amended the ordinance to remove the challenged provisions and eliminate the

requirement that guides need a permit to conduct tours. <u>See</u> <u>Flanigan's Enters.</u>, 868 F.3d at 1261 ("[T]he City's repeal is plainly an unambiguous termination of the challenged conduct. As an initial matter, the City has not merely declined to enforce the Ordinance against these Appellants; it has removed the challenged portion in its entirety."). Additionally, the City represented to Plaintiff, through its attorney, that it does not intend to resurrect the old provisions in the ordinance. (Doc. 51 at 4.)

Finally, in regards to the third factor, the Court finds that the City has maintained its commitment to the new legislative scheme. The City repealed or amended the challenged portions of the ordinance in 2015. The Tourism Management Plan (the "Tourism Plan"), adopted by the City on February 14, 2018, includes a strategy to "[e]ncourage tour companies to certify tour guides through the Tourism Leadership Council's Certified Tour Guides of Savannah Program" and lists this project as "ongoing" under the implementation schedule. (Doc. 72, Attach. 2 at 23.) It appears that the City has made substantial efforts with the tourism industry to provide for a voluntary certification program through the non-profit Tourism Leadership Council since the repeal of the challenged portions of the Tour Service Ordinance of 1978 and has publicly expressed its intent to continue to encourage voluntary certification. Therefore, the

16

Court finds that all of Plaintiffs' claims for declaratory and injunctive relief regarding the tour guide licensing scheme are moot and not properly before this Court.

This brings the Court to the second mootness question: whether Plaintiffs' prayer for nominal damages, and now a claim for compensatory damages of $10.00 for two Plaintiffs, saves Count I from being rendered entirely moot. Plaintiffs and the City both agree that the Eleventh Circuit changed the legal landscape regarding mootness with its holding in Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia, 868 F.3d 1248, 1264 (11th Cir. 2017), that a prayer for nominal damages will not save a case from dismissal where the constitutional challenge to legislation is otherwise moot. (Doc. 58 at 2.)

In Flanigan's Enterprises, the Eleventh Circuit held that a "previously justiciable case is moot when the requested relief, if granted, would no longer have any practical effect on the rights or obligations of the litigants." 868 F.3d at 1264. The Eleventh Circuit found that the appellants' only complaint was the existence of a constitutionally impermissible prohibition on their ability to sell the banned sexual devices and, accordingly, once the challenged law was repealed, "there is simply nothing left for [the court] to do." Id. at 1265. The Eleventh Circuit held that nominal damages, like a prayer for

17

declaratory relief, is insufficient to save an otherwise moot challenge. Id. at 1270.

There is a strong policy against courts providing impermissible advisory opinions. Flanigan's Enters., 868 F.3d at 1269. Decisions of the court "must be grounded in 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " Id. (quoting North Carolina v. Rice, 404 U.S. 244, 246, 92 S. Ct. 402, 404, 30 L. Ed. 2d 413 (1971)). Accordingly, courts must "generally decline to pass on the constitutionality of legislation unless as a necessity in the determination of real, earnest, and vital controversy between individuals." Id. (internal quotations and citation omitted).

Plaintiffs have made it abundantly clear that the prayer for compensatory damages in the amount of $10 for Plaintiffs Dan Leger and Michelle Freenor was only added to avoid dismissal based on mootness. Plaintiffs state that

> [a]s a direct result of this change in the
> law, Plaintiffs' claim for nominal damages
> may have been rendered moot. Plaintiffs
> therefore request leave to cure this newly
> created potential jurisdictional defect in
> their Complaint by supplementing their
> possibly moot request for nominal damages
> with a limited request for actual damages.

(Doc. 59 at 2.) The Court is concerned that this addition is an end-run around this Court's jurisdictional requirements and runs afoul of the policies explicitly discussed in <u>Flanigan's Enterprises</u>, 868 F.3d at 1264. As the Eleventh Circuit made clear in <u>Flanagan's Enterprises</u>, courts must not address the constitutionality of legislation unless there is a "real, earnest, vital controversy between the individuals." 868 F.3d at 1269. To do otherwise would be issuing an advisory opinion on hypothetical issues. <u>Id.</u> Where plaintiffs seek only prospective relief and nominal damages in an otherwise moot case, the court is only able to offer "judicial validation, through nominal damages, of an outcome that has already been determined," which is insufficient to support jurisdiction. <u>Id.</u> at 1268. The Eleventh Circuit noted that, if a mere prayer for nominal damages could save an otherwise moot case, "the jurisdiction of the court could be manipulated, the mootness doctrine could be circumvented, and federal courts would be required to decide cases that could have no practical effect on the legal rights or obligations of the parties." <u>Id.</u> at 1270.

The Court's concern in this case is that Plaintiffs' request for $10 in compensatory damages is simply an alternative way to plead nominal damages, i.e. a sum "awarded for symbolic, rather than compensatory purposes." <u>Id.</u> at 1268. The prayer for relief was only added to avoid dismissal and the $10 does not

truly compensate Plaintiffs Michelle Freenor and Dan Leger for the years of license renewals, examination fees, background check fees, and other amounts paid to be licensed by the City. It appears to this Court that Plaintiffs are akin to those litigants that seek a "psychic satisfaction" that their cause is a worthy one. Flanagan Enters., 868 F.3d at 1268.

Despite the Court's concerns, however, it is clear that " '[a]lthough a case will normally become moot when a subsequent [law] brings the existing controversy to an end, when the plaintiff has requested damages, those claims are not moot.' " Checker Cab Operators, Inc. v. Miami-Dade Cty., 899 F.3d 908, 916 (11th Cir. 2018) (quoting Covenant Christian Ministries, Inc. v. City of Marietta, 654 F.3d 1231, 1244 (11th Cir. 2011)). Because a claim for damages is retrospective and "does not depend on any threat of future harm, [the] claim remains a live controversy." Id. (internal quotations and citation omitted). In this case, Plaintiffs Michelle Freenor and Leger seek retrospective compensatory damages in addition to the nominal damages pled by all Plaintiffs under Count I of their complaint. (Doc. 64 at 22.) Accordingly, because this case includes claims for compensatory damages in addition to nominal damages, the Court finds that Count I is not moot. Checker Cab, 899 F.3d at 916.

## III. COUNT I: FIRST AMENDMENT ANALYSIS FOR THE LICENSING SCHEME

### A. Appropriate Level of Scrutiny

It is clear that "[t]he First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.' " Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015) (quoting U.S. Const., Amdt. 1). Therefore, a government, "including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' " Id. at 2226 (quoting Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95, 92 S. Ct. 2286, 2290, 33 L. Ed. 2d 212 (1972)). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed, 135 S. Ct. at 2227. Laws may also be content based, even if the laws appear content neutral on their face, if they "cannot be 'justified without reference to the content of the regulated speech,' or if the laws were adopted by the government 'because of disagreement with the message [the speech] conveys.' " Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)). In either event, content-based laws are subject to strict scrutiny and must be "narrowly tailored to serve compelling state interests." Id. at 2226.

In this case, Plaintiffs argue that the City's licensing scheme is a content-based regulation of speech that fails under strict scrutiny. (Doc. 30 at 10.) In its motion for summary judgment (Doc. 33) and response to Plaintiff's First Motion for Summary Judgment (Doc. 41), the City does not appear to contest that the First Amendment is implicated by its tour guide ordinance, but instead urges this Court to follow the decision of the United States Court of Appeals for the Fifth Circuit in Kagan v. City of New Orleans, La., 753 F.3d 560, 561 (5th Cir. 2014). (Doc. 33 at 14-17, Doc. 41 at 14-17.) In Kagan, the Fifth Circuit found the City of New Orleans's tour guide licensing scheme was content neutral and applied intermediate scrutiny. 753 F.3d at 562. The Fifth Circuit upheld the licensing scheme as constitutional and found that the law "effectively promoted the government interests, and without those protections for the city and its visitors, the government interest would be unserved." Id.

Plaintiffs, of course, argue that Kagan cannot be squared with Supreme Court precedent and urges this Court to instead follow the United States Court of Appeals for the District of Columbia Circuit's opinion in Edwards v. D.C., 755 F.3d 996 (D.C. Cir. 2014). (Doc. 42 at 18.) In Edwards, the D.C. Circuit evaluated the District of Columbia's tour guide licensing scheme but did not determine whether the law was content based because

it found the regulations would not survive even under intermediate scrutiny. 755 F.3d at 1000. In Edwards, the D.C. Circuit concluded that the licensing regulations failed to survive intermediate scrutiny because the District of Columbia failed to present any evidence that the alleged harms it sought to address actually existed and because "the District provided no explanation for abjuring the less restrictive but more effective means of accomplishing its objectives." Id. at 1009. In this case, as in Edwards, this Court does not need to determine whether the Tour Guide Licensing Ordinance is content based because the ordinance fails even under the more lenient standard of intermediate scrutiny applied to content-neutral laws.

   B. Intermediate Scrutiny

   Content-neutral regulations of speech are subject to intermediate scrutiny. Thus, under this standard, a government regulation is constitutional "provided the restrictions . . . 'are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " Ward, 491 U.S. at 791, 109 S. Ct. at 2753 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 3069, 82 L. Ed. 2d 221 (1984)); see also Buehrle v. City of Key W., 813 F.3d 973,

978 (11th Cir. 2015) (citing <u>Ward</u>, 491 U.S. at 791, 109 S. Ct. at 2753).

To be narrowly tailored, the content-neutral regulation "must not 'burden substantially more speech than is necessary to further the government's legitimate interests.' " <u>McCullen v. Coakley</u>, 573 U.S. 464, 486, 134 S. Ct. 2518, 2535, 189 L. Ed. 2d 502 (2014) (quoting <u>Ward</u>, 491 U.S. at 799, 109 S. Ct. at 2758). The regulation is not required to be " 'the least restrictive or least intrusive means' of serving the government's interests." <u>Id.</u> (quoting <u>Ward</u>, 491 U.S. at 798, 109 S. Ct. at 2757). However, "the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.' " <u>Id.</u> (quoting <u>Ward</u>, 491 U.S. at 799, 109 S. Ct. at 2758).

In this case, the City argues that its licensing scheme serves two governmental interests by ensuring that guides (1) "have the knowledge and proficiency to guide individuals who are visiting around our community," and (2) "are not criminals and could not . . . potentially harm visitors or individuals who are taking a tour." (Doc. 33 at 6 (quoting Lidy Dep. at 115-116).) Thus, the City argues that "requiring the licensees to know the City and not be felons or have other relevant recent criminal history, has effectively promoted the government interest in the promotion of its industry and the protection of its visitors."

(Doc. 41 at 17.) Plaintiffs argue that neither of these asserted interests can justify the City's licensing scheme. (Doc. 30 at 21.)

After careful review, the Court finds that these interests are sufficient government interests. The Eleventh Circuit has previously recognized that a city's interest in promoting tourism and economic activity is a significant government interest. See Smith v. City of Fort Lauderdale, Fla., 177 F.3d 954, 956 (11th Cir. 1999) (finding the city's restrictions on begging in the Fort Lauderdale Beach area to be narrowly tailored to serve the city's interest in providing a safe, pleasant environment and eliminating nuisance activity on the beach); Buehrle, 813 F.3d at 978 (finding that the city's fear that allowing additional tattoo establishments to operate in the historic district would adversely impact the historic district and the tourism that the district attracts are substantial government interests).

However, a finding that the City's interest is substantial does not end the Court's inquiry. The regulation must be narrowly tailored to serve this interest. Ward, 491 U.S. at 791, 109 S. Ct. at 2753. Thus, the Court "do[es] not simply take the City at its word that the ordinance serves the aforementioned interests. Instead, the City must demonstrate that it had a reasonable basis for believing that its regulation would further

these legitimate interests." Buehrle, 813 F.3d at 978-79. There must "be a direct causal link between the restriction imposed and the injury to be prevented." United States v. Alvarez, 567 U.S. 709, 725, 132 S. Ct. 2537, 2549, 183 L. Ed. 2d 574 (2012).

In demonstrating that the recited harms are real and that the regulation will in fact alleviate these harms, "a municipality cannot 'get away with shoddy data or reasoning." Buehrle, 813 F.3d at 979 (quoting City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 438, 122 S. Ct. 1728, 1736, 152 L. Ed. 2d 670 (2002) (plurality opinion)). Instead, it "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664, 114 S. Ct. 2445, 2470, 129 L. Ed. 2d 497 (1994) (citing Edenfield v. Fane, 507 U.S. 761, 770-771, 113 S. Ct. 1792, 1800-1801, 123 L. Ed. 2d 543 (1993); Los Angeles v. Preferred Commc'n, Inc., 476 U.S. 488, 496, 106 S. Ct. 2034, 2038, 90 L. Ed. 2d 480 (1986)). Municipalities may rely on its " 'own findings, evidence gathered by other localities, or evidence described in a judicial opinion.' " Buehrle, 813 F.3d at 979 (quoting Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., 337 F.3d 1251, 1268 (11th Cir. 2003)). The Court finds that the City has failed to meet its

burden for the following reasons and will address each asserted interest in turn.

       1.   The exam requirement

In regards to the exam requirement, the City claims that the exam and tour manual "ensure that the licensed tour guides have the knowledge and proficiency to guide individuals who are visiting around our community." (Doc. 33 at 6.) However, the City fails to provide evidence that unknowledgeable guides are an issue for the City and pose a threat to the safety or enjoyment of tourists.

Other than the City's statement that the examination ensures that tour guides are knowledgeable, the City's 30(b)(6) witness did not supply any evidence of specific harms that the examination addresses. In its motion for summary judgment, the City does not cite to any studies conducted, evidence relied on from other jurisdictions, or provide any anecdotal evidence that unknowledgeable guides are, or have historically been, an issue for the City. The City did not present studies or an expert that have found that requiring tour guides to pass an examination produces more knowledgeable tour guides. The City has failed to carry its burden to present evidence that the problems it sought to alleviate actually existed, either when the ordinance was originally enacted or when the ordinance was in force.

The Court also finds that the City's examination requirement is not narrowly tailored to serve the government interest in having knowledgeable tour guides leading tours. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." McCullen, 573 U.S. at 495, 134 S. Ct. at 2540. The City did not present any evidence that alternative measures, namely a voluntary certification for tour guides, would not achieve the City's interests less effectively than mandatory licensure. The City admits that voluntary certification is used in other cities. (Doc. 41, Attach. 1 at ¶ 80.) The City's 30(b)(6) witness testified that the City is aware of those voluntary certification programs and the City was, at that time, looking at these programs in a best practices review. (Doc. 31 at ¶ 82; Doc. 41, Attach. 1 at ¶ 82). Dr. Barbara Fertig, a professor at Armstrong University, who developed both the Manual and examination, testified that there would be a "very negative" impact in Savannah without a tour guide licensing scheme in that the City would not "be able to demand the respect that the history of this city requires." (Doc. 33, Attach. 2 at 46.) However, Dr. Fertig also testified that the completely voluntary certification program in New Orleans, ran by Friends of Cabildo,

is a "superior program" that produces "more than effective" tour guides. (Id. at 46.) In sum, the City has failed to present evidence that this alternative would not serve its interests as effectively as the more burdensome ordinance that requires guides to pass an examination.

### 2.   The background check requirement

In regards to the background check, the City claims that the background check ensures guides "are not criminals and could not potentially harm visitors or individuals who are taking a tour." (Doc. 33 at 6.) Specifically, the City claims that the presence of the background check requirement (1) prevents individuals with criminal backgrounds from becoming tour guides and harming tourists, (2) prevents child molesters from giving tours to groups that may include children, and (3) prevents tourists from being scammed. (Id. at 9.)

The City's 30(b)(6) witness testified that she was aware of only one instance in which an applicant with a criminal background applied for a tour guide license. (Doc. 33 at 89.) In that one instance, the applicant ultimately received a license. (Id.) The City did not cite any evidence that tourists have been harmed by a tour guide that had a prior criminal background or that tourists were physically assaulted or harmed by individuals holding themselves out to be guides and scamming tourists.

Other factors that cut against support for the background check is the fact that Savannah Code of Ordinances § 6-1511 dictates that a felony conviction will bar the issuance of a license only if it occurred within the last three years. (Doc. 33 at 47.) Because the Tour Guide Licensing Ordinance did not completely bar a person with a criminal background from becoming a licensed tour guide, the Court is unsure how the background check requirement truly served the stated interest of ensuring individuals with criminal backgrounds do not become tour guides. Finally, the City did not require tour escorts to pass a background check even though they accompany tour groups and interact with tourists. (Doc. 33, Attach. 1 at 18.) These inconsistencies within the City's ordinances undermines the City's assertion that their interest in ensuring tourists' safety is actually served by requiring tour guides to pass a criminal background check.

The City's 30(b)(6) witness also stated that the background check would prevent a scenario from occurring wherein a convicted child molester might attempt to lead tours of girl scouts. (Doc. 33, Attach. 1 at 3.) While a municipality can rely on its own findings or the findings of other localities, Buehrle, 813 F.3d at 979, the City admitted that it does not have evidence that registered sex offenders lead tours in any cities that do not have a licensing requirement, nor does it

have evidence that a convicted child molester has ever sought a license from the City. (Doc. 33, Attach. 1 at 3.) The City has not carried its burden to demonstrate that the harm of a convicted sex offender or other criminal leading tours is "real, [and] not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Turner Broad. Sys., 512 U.S. at 664, 114 S. Ct. at 2470.

Finally, the City claims that a background check helps prevent tourists from being scammed by fraudulent tour guides. The City's 30(b)(6) witness testified that the City has had issues with homeless individuals scamming tourists in Savannah. These scams include attempting to sell "parking spaces in a public parking lot" on River Street, selling free maps of Savannah to tourists, and soliciting tourists to pay them after telling the tourists information. (Doc. 33, Attach. 1 at 4, 8.) According to the City, these individuals "try to identify tourists in order to secure funding for whatever it is that they need" and that these occurrences would "jeopardize the visitor experience when [tourists] come here" if the tour guide licensing regulation was not in place. (Id. at 4.)

Specifically, the City's 30(b)(6) witness testified that the City has cited Jerry Spence, who has a criminal background, twice for giving tours without a license. The City stated that on one occasion the visitors were "not feeling safe with the

situation at hand." (Id.) The City's 30(b)(6) witness alluded to a police report that was filed against Mr. Spence involving his behavior during a purported tour. The City, however, did not provide this police report as evidence that harms would befall tourists without the tour guide licensing scheme in place. (Id.) In addition to the instance regarding Mr. Spence, the City provided anecdotal evidence that a man in Forsyth Park attempted to get tourists to pay him after he told them information about the fountain in the park and other things in the area. (Doc. 33, Attach. 1 at 10.)

However, other than the example with Mr. Spence and the man in Forsyth Park, the City did not provide evidence that there is a special scam by which the homeless population targets tourists and scams them by purporting to be tour guides. In fact, the testimony seems to indicate that the "scams" range from attempting to sell public parking spots to selling free maps of Savannah to tourists. (Doc. 33, Attach. 1 at 4, 8.) The City claims that the licensing regime prevents this behavior, however, there is no evidence that the licensing of tour guides prevents homeless individuals from attempting to sell public parking spots or otherwise approaching tourists and scamming them. Additionally, there is no evidence in the record that the background check requirement of the tour guidance ordinance serves to address any kind of targeted scam related to

individuals purporting to be tour guides. See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 169, 122 S. Ct. 2080, 2091, 153 L. Ed. 2d 205 (2002) (finding that an ordinance regulating door-to-door solicitation was unconstitutional in part because the government's crime prevention interest was not served where the ordinance would not preclude criminals from knocking on doors and engaging in conversations not covered by the ordinance and because there was no evidence of a special crime problem related to door-to-door solicitation).

The City did not point to police reports, studies, or further anecdotal evidence that unlicensed guides have actually posed a danger to tourists. The only other piece of arguable evidence that the City presents is a document titled "Exhibit F News Reports Regarding Problems with Unscrupulous Tour Guides in Tourist Destinations" that was filed by the City of Charleston in Billups v. City of Charleston, S.C., 331 F. Supp. 3d 500 (D.S.C. 2018). The City, in its response to Plaintiff's Second Motion for Summary Judgment, states that these reports "are tendered for the same reasons that the City of Charleston tendered them"—i.e. that the City of Charleston "had reason to worry about unknowledgeable or fraudulent tour guides." (Doc. 68 at 2.)

33

The Court finds this collection of news articles is inadequate to the extent that the City is offering these articles to demonstrate that its governmental interests are served by its tour guide ordinance. The Court acknowledges that the City of Savannah and the City of Charleston share numerous similarities, including a vibrant tourism industry in both cities. The City, however, cannot attach exhibits from another case without any explanation as to how these articles apply to this action. Thus, while the City may provide evidence gathered by other localities or evidence described in a judicial opinion, the Court cannot evaluate that evidence if the City fails to tie that evidence to the City's governmental interests in its own tour guide licensing scheme. The City did not include any argument as to how its tour guide licensing scheme prevents the unscrupulous tour guides mentioned in the articles from taking advantage of tourists in Savannah. However, to the extent that the City is offering the news articles to show that it has a governmental interest in preventing unknowledgeable guides or fraudulent guides from victimizing the City's tourists and harming the tourism industry, the Court notes that it has already found that these interests are significant governmental interests.

Ultimately, the Court finds that a handful of anecdotes is not sufficient to sustain the City's burden to demonstrate that

the tour guide licensing scheme actually serves its interests. See Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1312 (11th Cir. 2017) (finding six anecdotes were ultimately not sufficient to demonstrate harms asserted were " 'real, [and] not merely conjectural," such that Florida's Firearm Owners' Privacy Act provisions 'will in fact alleviate these harms in a direct and material way.' " (quoting Turner Broad. Sys., 512 U.S. at 664, 114 S. Ct. at 2470)). The Court also notes that none of the evidence presented by the City was pre-enactment evidence that the ordinance serves a significant government interest. See Buehrle, 813 F.3d 973, 979 (11th Cir. 2015) (stating that the city must rely on at least some pre-enactment evidence that the regulation would serve the city's asserted interests). The Court, therefore, finds that the Tour Guide Licensing Ordinance is not " 'narrowly tailored to serve a significant governmental interest.' "[2] Ward, 491 U.S. at 791, 109 S. Ct. at 2753 (quoting Clark, 468 U.S. at 293, 104 S. Ct. at 3069). Accordingly, in regards to Count I of the Amended Complaint, the Court **GRANTS** Plaintiffs' First Motion for Summary Judgment (Doc. 30) and Second Motion for Summary Judgment (Doc. 66) and **DENIES** the City's Motion for Summary Judgment (Doc. 33).

---

[2] Because the Court finds that the Tour Guide Licensing Ordinance is not narrowly tailored, the Court does not reach whether the ordinance leaves open ample alternative channels for communication of the information.

IV.  COUNT II: FIRST AMENDMENT ANALYSIS FOR THE PRESERVATION FEE

Plaintiffs also challenge the Preservation Fee, Savannah Revenue Ordinance Art. T, § 3, on the grounds that it constitutes a "speech tax" that singles out the First Amendment activity of tour guides for special tax burdens. (Doc. 30 at 25.) Plaintiffs further contend that the City's "interest in raising revenue can readily be achieved through a general tax." (Id. at 26.) The City argues that this Court should refrain from deciding the merits of this claim under the comity doctrine and cites cases that briefly mention the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341. (Doc. 41 at 23.) The City does not otherwise raise or rely on the TIA in its briefs or motion for summary judgment. For their part, Plaintiffs contend that the TIA does not apply to bar their challenge to the Preservation Fee because the TIA only bars " 'taxes,' which raise general revenue, but does not bar challenges to 'regulatory fees,' which 'rais[e] money placed in a special fund to help defray . . . regulation-related expenses.' " (Doc. 42 at 25 (quoting San Juan Cellular Telephone Co. v. Pub. Serv. Comm'n, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, J.)).)

The City requests that this Court abstain from hearing Plaintiffs' challenge to the Preservation Fee under the doctrine of comity. (Doc. 33 at 22.) Comity is a prudential doctrine, not a jurisdictional bar. Levin v. Commerce Energy, Inc., 560 U.S.

413, 432, 130 S. Ct. 2323, 2336, 176 L. Ed. 2d 1131 (2010). "Comity's constraint has particular force when lower federal courts are asked to pass on the constitutionality of state taxation of commercial activity." Id. at 421, 130 S. Ct. at 2330. This prudential doctrine arises "[w]hen economic legislation does not employ classifications subject to heightened scrutiny or impinge on fundamental rights." Id. at 426, 130 S. Ct. at 2333. The TIA, however, is a jurisdictional bar. Terry v. Crawford, 615 F. App'x 629, 630 (11th Cir. 2015) (" 'The Tax Injunction Act is a jurisdictional rule and constitutes a broad jurisdictional barrier.' " (quoting I.L. v. Alabama, 739 F.3d 1273, 1282 (11th Cir. 2014))). This Court must evaluate whether it has subject matter jurisdiction to consider Count II as it is "the duty of the court to examine the question of subject matter jurisdiction whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction." Allstate Ins. Co. v. James, 779 F.2d 1536, 1538 (11th Cir. 1986).

The TIA mandates that district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. " 'Tax under state law' " has been interpreted to remove from federal jurisdiction, review of state laws that are intended to

raise revenue for general municipal purposes, provided that the plaintiff has an adequate remedy in state court." Miami Herald Pub. Co. v. City of Hallandale, 734 F.2d 666, 670 (11th Cir.), opinion clarified, 742 F.2d 590 (11th Cir. 1984). The TIA applies to any state tax, including municipal and local taxes. Scott Air Force Base Props., LLC v. Cty. of St. Clair, Ill., 548 F.3d 516, 520 (7th Cir. 2008) (citing Hager v. City of W. Peoria, 84 F.3d 865, 868 n.1 (7th Cir. 1996)); Collins Holding Corp. v. Jasper Cty., S.C., 123 F.3d 797, 799 n.2 (4th Cir. 1997). However, "to the extent the statute challenged is regulatory rather than revenue raising in purpose, the measure does not constitute a tax, and the district court retains jurisdiction." Id. (citing Mobil Oil Corp. v. Tully, 639 F.2d 912, 917-18 (2d Cir. 1981)); see also GenOn Mid-Atl., LLC v. Montgomery Cty., Md., 650 F.3d 1021, 1023 (4th Cir. 2011) (finding that under the TIA, a court must "ask whether ask whether the charge is levied primarily for revenue raising purposes, making it a tax, or whether it is assessed primarily for regulatory or punitive purposes, making it a fee." (internal quotation marks omitted)).

Like in Miami Herald, the question here is whether the purpose of the Preservation Fee "is to raise revenue for the city or to regulate licensees." Id. When determining whether the charge is a fee or a tax, this Court does not " 'focus on the

38

superficial nomenclature provided to the charge at issue.' "
GenOn, 650 F.3d at 1023 (quoting Valero Terrestrial Corp. v.
Caffrey, 205 F.3d 130, 134 (4th Cir. 2000)); see also Marcus v.
Kansas Dep't of Revenue, 170 F.3d 1305, 1311 (10th Cir. 1999)
("The label given by a state for an assessment or charge is not
dispositive."). The United States Court of Appeals for the First
Circuit considered the difficult task of distinguishing between
"taxes" and "fees" and found that courts

> have sketched a spectrum with a paradigmatic
> tax at one end and a paradigmatic fee at the
> other. The classic "tax" is imposed by a
> legislature upon many, or all, citizens. It
> raises money, contributed to a general fund,
> and spent for the benefit of the entire
> community. The classic "regulatory fee" is
> imposed by an agency upon those subject to
> its regulation. It may serve regulatory
> purposes directly by, for example,
> deliberately discouraging particular conduct
> by making it more expensive. Or, it may
> serve such purposes indirectly by, for
> example, raising money placed in a special
> fund to help defray the agency's regulation-
> related expenses.

San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico,
967 F.2d 683, 685 (1st Cir. 1992). The First Circuit, however,
noted that cases in the middle of this spectrum tend to
"emphasize the revenue's ultimate use, asking whether it
provides a general benefit to the public, of a sort often
financed by a general tax, or whether it provides more narrow
benefits to regulated companies or defrays the agency's costs of

regulation." Id. The United States Court of Appeals for the Fifth Circuit in Henderson v. Stalder, 407 F.3d 351, 356 (5th Cir. 2005), similarly described the difference between the classic tax and the classic fee. The classic tax "sustains the essential flow of revenue to the government," is imposed by a state or municipal legislature, and "is designed to provide a benefit for the entire community." Henderson, 407 F.3d at 356. The classic fee, meanwhile, is linked to some regulatory scheme, is imposed by an agency upon those it regulates, and is "designed to raise money to help defray an agency's regulatory expenses." Id.

The United States Court of Appeals for the Eleventh Circuit, when evaluating whether the TIA deprives federal courts of jurisdiction, likewise focuses on the law's primary purpose and what entity imposes the charge. In 2014, the Eleventh Circuit found that the TIA did not deprive the district court of jurisdiction to hear a challenge to Georgia's Insurance Delivery Enhancement Act of 2011 ("IDEA") because the fees, fines, and assessments collected pursuant to IDEA are regulatory in nature and not intended to raise revenues. Am.'s Health Ins. Plans v. Hudgens, 742 F.3d 1319, 1328 (11th Cir. 2014). The Eleventh Circuit noted that the "challenged provisions' primary purpose is to regulate the timeliness and manner of payment to health care providers." Id. The Eleventh Circuit also relied on the

fact that a regulatory agency was responsible for administering and collecting IDEA's penalties. Id. (citing Collins, 123 F.3d at 800; San Juan, 967 F.2d at 685-86).

In this case, the City stated that the Preservation Fee "was enacted to raise revenue from tourists in the Historic District which would be earmarked for maintaining tourism support functions." (Doc. 33 at 14.) Some uses of the earmarked funds includes "restoration and maintenance of squares and monuments." (Id. at 24.) The City produced a chart that lists the City's use of the Preservation Fee since 1998. (Doc. 33, Attach. 2 at 62-66.) In 2014, the Preservation Fee funded, or contributed to, the following projects: Atlantic Mall Lighting; Monument Conservation; Park, Square, Median, Irrigation Improvements; Square Renovation; Montgomery Street Ramp; and River Street Ramp Reconstruction. (Id. at 62.) In 2010, the funded projects included: Square Renovation; Rousakis Plaza and Riverfront Repairs; River Street Ramp Reconstruction; and Downtown Entryways Beautification. (Id.) These projects are not at all connected to the administration of the tour guide licensing scheme.

Moreover, the City has stated that the purpose of the Preservation Fee is to raise revenue for the City to complete certain projects that impact tourism. The minutes for the City Council meeting on December 9, 1997 state that the purpose of

41

the Preservation Fee is to generate "funds for infrastructure preservation and improvement." (Doc. 30, Attach. 31 at 2.) There is also a Capital Improvement Program issued by the City for the years 2013 to 2017 in which the City "presents the five-year capital plan for the City of Savannah." In the five-year capital plan, the City listed each category of improvement or infrastructure and included within that category "a summary of all revenue sources." (Doc. 30, Attach. 32 at 7.) The Capital Improvement Program specifically states that the "General Fund Preservation Fee is projected to contribute $3,100,000 to mostly tourism-related capital projects during the five-year period." (Id. at 8.)

From these sources, the Court finds that the Preservation Fee is more akin to a general tax that provides a general benefit to the public than a fee. The money received by the City is used to pay for capital improvements that benefits residents of the City as well as tourists. The City has clearly stated that the Preservation Fee is designed to raise revenue for tourism capital projects. There is no evidence that the fee offsets the administrative expenses of the now repealed licensing scheme in the tour guide ordinance. Additionally, the Preservation Fee is levied by the City of Savannah City Council. (Doc. 30, Attach. 23 at 4.) 2015 Revenue Ordinance Article T, § 3(D) provides that each tour business shall "remit

preservation fees to the City Revenue Department" and § 3(H) requires tour service businesses to provide access to "any authorized representative of the City Revenue Department" of all company records. (Doc. 30, Attach. 23 at 6-7.) The City levies and collects the Preservation Fee.

Having found that the Preservation Fee is a tax, the Tax Injunction Act will bar the exercise of federal jurisdiction if two conditions are met: "(1) the relief requested by the plaintiff will 'enjoin, suspend, or restrain' a state tax assessment and (2) the state affords the plaintiff a "plain, speedy and efficient remedy.' " Williams v. City of Dothan, Ala., 745 F.2d 1406, 1411 (11th Cir. 1984) (quoting 28 U.S.C. § 1341). The TIA prohibits requests for declaratory and injunctive relief. Kelly v. Alabama Dep't of Revenue, 638 F. App'x 884, 889 (11th Cir. 2016). It is clear that Plaintiffs seek to enjoin and suspend the Preservation Fee. Plaintiffs request "[a] declaratory judgment by the Court that, facially and as applied to Plaintiffs, the speech tax codified at Savannah 2014 Revenue Ordinance Article T, § 3 violates the First Amendment to the United States Constitution," and "[p]ermanent injunctive relief prohibiting Defendant or its agents from enforcing the speech tax codified at Savannah 2014 Revenue Ordinance Article T, § 3." (Doc. 64 at 21-22.)

The next consideration is whether there is a plain, speedy and efficient remedy at state law. Williams, 745 F.2d at 1411; Hedgepeth v. Tennessee, 215 F.3d 608, 615 (6th Cir. 2000). The City claims "an adequate state-court forum is available to hear and decide constitutional claims."[3] (Doc. 33 at 25.) The test of whether a state court procedure is adequate is "whether it provides taxpayers 'with a full hearing and judicial determination at which [they] may raise any and all constitutional objections to the tax.' " Williams, 745 F.2d at 1412 (quoting Rosewell v. LaSalle Nat. Bank, 450 U.S. 503, 514, 101 S. Ct. 1221, 1230, 67 L. Ed. 2d 464 (1981)).

Plaintiffs did not challenge the City's claim that there is a plain, speedy and efficient state-court remedy and have not argued or suggested that there is no plain, speedy and efficient state-court remedy to challenge the Preservation Fee. Plaintiffs instead challenged the applicability of the TIA on the grounds that the Preservation Fee is a regulatory fee and not a tax. (Doc. 42 at 25.) It is Plaintiffs' burden to show facts

---

[3] The City argued that there is an available state forum when discussing the application of the comity doctrine. "The Supreme Court has found 'no significant difference' between the TIA's requirement for a 'plain, speedy and efficient' state remedy and comity's requirement for a 'plain, adequate and complete' state remedy." Kelly, 638 F. App'x at 890 (quoting Fair Assessment in Real Estate Ass'n, Inc. v. McNary, 454 U.S. 100, 116 n.8, 102 S. Ct. 177, 186 n.8, 70 L. Ed. 2d 271 (1981)).

sufficient to overcome the jurisdictional bar of the TIA. <u>Terry</u>, 615 F. App'x at 631; <u>Kelly</u>, 638 F. App'x at 889.

Because neither party has substantively addressed the TIA or the Court's jurisdiction over Count II, this Court finds that further briefing is warranted. "A plaintiff must have ample opportunity to present evidence bearing on the existence of jurisdiction." <u>Colonial Pipeline Co. v. Collins</u>, 921 F.2d 1237, 1243 (11th Cir. 1991). Accordingly, the City is **DIRECTED** to file a brief addressing whether there is a plain, speedy, efficient state court remedy to challenge the Preservation Fee.  The City shall have twenty days from the date of this order to file its brief, after which the normal briefing schedule will apply to Plaintiffs' response and any subsequent replies. The Court will accordingly **HOLD IN ABEYANCE** the parties' motions for summary judgment as to Count II until the Court has received the requested briefing.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES IN PART** and **HOLDS IN ABEYANCE IN PART** the City's Motion for Summary Judgment (Doc. 33) and **GRANTS IN PART** and **HOLDS IN ABEYANCE IN PART** Plaintiffs' First Motion for Summary Judgment (Doc. 30) and Second Motion for Summary Judgment (Doc. 66). In sum, with respect to Count I of the amended complaint, the Court **GRANTS** Plaintiffs' First Motion for Summary Judgment (Doc. 30) and

Second Motion for Summary Judgment (Doc. 66) and **DENIES** the City's Motion for Summary Judgment (Doc. 33). With respect to Count II of the amended complaint, the Court **HOLDS IN ABEYANCE**[4] Plaintiffs' First Motion for Summary Judgment (Doc. 30), Plaintiffs' Second Motion for Summary Judgment (Doc. 66), and the City's Motion for Summary Judgment (Doc. 33). As set out above, the City is **DIRECTED** to file a brief addressing whether there is a plain, speedy, efficient state court remedy to challenge the Preservation Fee. The City shall have **twenty days** from the date of this order to file its brief, after which the normal briefing schedule will apply to Plaintiffs' response and any subsequent replies.

SO ORDERED this _20th_ day of May 2019.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[4]  The Clerk of Court is **DIRECTED** to terminate Plaintiff's Second Motion for Summary Judgment (Doc. 66) for statistical purposes only.